UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMERICAN HOMELAND TITLE AGENCY, INC., JOHN YONAS, MARTIN RINK, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:15-cv-02059-SEB-DML |
| vs. | ) ) | |
| STEPHEN W. ROBERTSON Commissioner, | ) ) ) | |
| Defendant. | ) | |

## ORDER ON PENDING MOTIONS

Plaintiffs American Homeland Title Agency, Inc., John Yonas, and Martin Rink, have brought this action against Defendant Stephen W. Robertson in his individual capacity as well as his official capacity as Commissioner of the Indiana Department of Insurance, claiming that their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment were violated by the Department. Plaintiffs seek a Declaratory Judgment and Permanent Injunction as well as money damages. Now pending before the Court are Defendant's Motion to Dismiss for Lack of Standing [Dkt. No. 110]; Motion in Limine (to Exclude Expert Testimony) [Dkt. No. 112]; Motion for Oral Argument on Pending Motions [Dkt. No. 117], and Motion for Summary Judgment [Dkt. No. 120], all of which were filed on October 16, 2017. Plaintiffs responded on November 22, 2017 [Dkt. No. 129] and Defendant replied on December 13, 2017 [Dkt. No. 144]. The motions are ripe for ruling. For the reasons detailed below, we **DENY** Defendant's Motion to Dismiss

Plaintiffs' Complaint for lack of Standing, <u>DENY</u> Defendant's Motion for Oral Argument, <u>GRANT</u> Defendant's Motion in Limine, and <u>GRANT</u> Defendant's Motion for Summary Judgment.

## Factual and Procedural Background

The facts of this case have been set forth in detail in our ruling on Defendant's first Motion to Dismiss (Dkt. No. 69) and were summarized thereafter in our order on Defendant's second Motion to Dismiss (Dkt. No. 80). For convenience, we recount again here the relevant facts underlying our previous orders as well as the procedural history of the case, adding certain facts that have been recently advanced in the parties' current briefing. Dkt. No. 111, Defendant's Brief in Support of Motion to Dismiss for Lack of Standing ("Def.'s Br."); Dkt. No. 129, Plaintiffs' Response in Opposition to Defendant's Motions ("Pls' Resp.").

Plaintiff American Homeland Title Agency, Inc. ("American Homeland"), an Ohio company, performs title searches of real property and sells title insurance policies to protect purchasers against future losses resulting from defects of title. In the title insurance business for over ten years primarily in Ohio, American Homeland entered the Indiana market and began providing these services here some time prior to January 2015. The co-owners of American Homeland, Martin Rink and Josh Yonas, are both licensed attorneys who have invested many years in the insurance business.

The IDOI is the Indiana government entity charged with regulating title insurance companies doing business in Indiana. To perform this function, the IDOI employs a team of examiners who conduct audits of insurers' agencies pursuant to Ind. Code § 27-1-3.1-

10 in order to ensure compliance with Indiana statutes and regulations. Following the audit, the IDOI follows a process for determining fines and penalties for companies found to have violated Indiana law, which includes providing the company with a copy of an examination report within sixty days of the completion of an examination. Ind. Code § 27-1-3.1-10(b). At the time of the events leading up to this litigation, IDOI's staff included Jonathan Handsborough, a non-attorney investigator/auditor, and attorney Joshua Harrison.

In or around September 2014 at the direction of Commissioner Robertson, the IDOI began using an internally produced document as guidance for its examiners in exercising its regulatory discretion and determining "generally reasonable" fines and penalties to impose on agencies or agents found to have committed violations of Indiana insurance law. Deposition of Joshua Harrison, Dkt. No. 118-1 ("Harrison Dep.") at 17-18. IDOI examiners understood that "in every instance, specific facts and circumstances must be considered to determine an appropriate outcome." *Id.* at 19.

As former IDOI Commissioner Randall Evans explained, in conducting an audit an IDOI examiner makes findings, determines the appropriate fines and penalties per applicable guidelines, and then brings the information to the IDOI enforcement division director. Dkt. No. 118-7, Deposition of Randall Evans ("Evans Dep."). Once the agency formulates an Agreed Entry, the examiner drafts the Final Order, which goes to the director, back to the examiner, on to an attorney within the Department, then back to the examiner, and finally to the Commissioner. Deposition of Jonathan Handsborough, Dkt. No. 118-8 ("Handsborough Dep.") at 29. Commissioner Robertson's role is to "review and sign off on [] recommendations to him for fines and penalties, revocations of

licenses." Evans Dep. at 11. Although the Commissioner is the "final decision-maker," as a general matter, he "tends to follow" the recommendations of his staff. *Id*. at 27.

In January 2015, the IDOI selected American Homeland for audit, pursuant to which Handsborough, then-Senior Insurance Examiner at the IDOI, after reviewing 166 incidents involving American Homeland, discovered hundreds of violations, including deficiencies such as the following: 148 files in which unlicensed employees signed HUD-1 Settlement Statements; numerous outstanding checks that were six months old or older; 145 policies in which the Title Insurance Enforcement Fund Fee was not disclosed on the HUD-1 Settlement Statement as required by law; 93 transactions with excessive lag times for policy remittance; 250 policies that were not submitted for inclusion into the Residential Real Estate Acquisition of Licensee Information and Numbers Database; 139 files in which customers were overcharged for premiums by amounts ranging from $75 and $625, amounts in some instances up to four times the underwriter listed rates; and files lacking the provision of Closing Protection Letters when required.[1] Dkt. No. 118-2.

Based upon Handsborough's findings, the IDOI determined that American Homeland had engaged in conduct violative of Indiana title statutes and regulations and recommended imposition of a $70,082 fine and a requirement that the company reimburse Indiana consumers in the amount of $42,202.

---

[1] The IDOI considered these violations extensive. In fact, it found that American Homeland alone was responsible for approximately fifteen percent of all violations involving the forty-seven entities that have been sanctioned following the Department's adoption the Guidelines and before the time this lawsuit was brought. Dkt. No. 118-3. As discussed more fully below, American Homeland does not dispute that it committed these violations.

On February 11, 2015, Handsborough emailed Plaintiffs Rink and Yonas a detailed list of violations along with corresponding fines and penalties. Dkt. No. 118-4 (2/20/2017 Letter). A few days later, Handsborough contacted Yonas and Rink by phone to follow up.[2] During the call, Handsborough emphasized that "the reimbursement piece [of the recommended sanctions] is a must." Dkt. No. 118-5 at 2 (Trans. 2/17/2015) He also encouraged Rink and Yonas to request that their internal accountants "come up with your number then we can actually look at the two and see where we might have discrepancies, so on and so forth," acknowledging that he (Handsborough) himself "is not perfect either." *Id.*

After asking for some "wiggle room" regarding these penalties for unlicensed individuals signing documents, Yonas said to Handsborough, "I'm not trying to be confrontational but if this is not negotiable, I can tell you, no Indiana consumer's going to get reimbursed 'cause we're going to close the doors." *Id*. at 3-4. In the response to the remark about Plaintiffs' ability to remain in business, Handsborough said:

> Yeah, I mean it's definitely not our intent to put people out of Business. I mean obviously I don't want people out of work and so on and so forth and yeah you guys could go find jobs, but there are people that work there in the office that probably wouldn't be as easy for them as it is for you all. But at the same time please understand if you guys aren't writing this business in Indiana[;] people in Indiana probably would be writing it, so I do see both sides of it in terms of [how] that goes but yeah you've got people there are just trying to feed their family.

---

[2] Although Handsborough reportedly neither knew of nor consented to it, Yonas recorded this conversation. However, no recording or transcript was made part of the record before us.

*Id*. Yonas and Rink apparently heard that comment as proof that the IDOI prefers in-state companies over out-of-state companies like theirs. When asked later about the meaning of this comment, Handsborough stated: "[M]y intent was that if they don't write the business in Indiana, then the Indiana business will get written." Handsborough Dep. at 129. There is no evidence in the record before us that Commissioner Robertson endorsed, let alone knew about this comment.

During the same telephone conversation, Rink and Yonas voluntarily offered to give up their Indiana insurance licenses; Yonas remarked: "If you guys say, hey, listen, these guys are horrible agents, we don't want them doing business in Indiana, we're willing to surrender our license. I mean, we've had our fill of Indiana. We really don't want Indiana." *Id*. at 5.

Handsborough informed Plaintiffs that they had two options going forward: (1) to pay the fine and penalty and also reimburse the customers of Indiana for the amounts they were overcharged; or (2) engage in a hearing with an administrative law judge to review and perhaps challenge the violations uncovered during the audit examination and the corresponding penalties and fines. *Id*. at 6-7. Handsborough further advised that if a hearing were requested it could involve a longer period of review than the three years he had included in his examination and might entail "the possibility of additional fines." *Id*. at 6-7. In terms of lowering the fine amount, Handsborough explained that his "ability to be flexible" was limited "based on the numbers." *Id.* at 8. Specifically, Handsborough said that nearly "every single [filed reviewed] had the violations in it." *Id.* "The volume wasn't the issue, the issue was the mistakes that were made in that volume." *Id.*

Plaintiffs claim to have been shocked by the amount of fines and penalties recommended by the IDOI, which prompted Yonas to attempt to negotiate: "I mean, obviously, the refunding part, we made a mistake but there is, are you, like, telling me that there's absolutely no way that the fine part can be some bit negotiated at all?" *Id*. Acknowledging that Yonas and Rink fully cooperated in the examination, Handsborough invited Plaintiffs to make a counteroffer that he could take to his supervisors, *id* at 9, which is what they did by letter dated February 20, 2015. Dkt. No. 118-6 (2/20/2017 Letter).

In that letter, Plaintiffs recounted instances in which they had helped "rid[] our industry of fraudsters" and described "transactions that [they] handled personally for Mitch Daniels," former Governor of Indiana." *Id*. at 3-4. In terms of a counteroffer, they offered the following:  American Homeland would: (1) "determine the overcharges" and refund consumers that amount; (2) offer four one- to two-hour educational seminars for Ohio agents; (3) pay an administrative fee of $5,000; and (4) acquiesce in future audits. *Id*. at 6.

The IDOI's then-Director of the Title Division, Randall Evans, found their counteroffer unacceptable, lacking any "indication that [Plaintiffs] were willing to work with us or implement a policy that would correct this." Dkt. No. 118-7 at 68. Handsborough agreed with Evans, stating that in his view, "the violations justif[ied] a higher fine and penalty, and [he] also disagree[d] with the agency determining what their overcharges are going to be and then refunding based on those overcharges." Handsborough Dep. at 132.

Yonas alleges that he and Rink later learned that their attempt to engage in negotiations was viewed by IDOI Commissioner Robertson as insulting and that he (Robertson) regarded their hiring of an attorney as harmful to their case. Dkt. No. 118-9

Deposition of Josh Yonas ("Yonas Dep.") at 63-67. Yonas testified that he felt "extorted" by the large dollar amount of the fine communicated to them during the phone call with the IDOI. *Id.* at 67. Handsborough has testified that he is aware of no department view or policy that discouraged American Homeland from hiring an attorney; to the contrary, he says he recognized that "[t]he two owners of American Homeland are attorneys, I'm not an attorney, so I would say that they are probably in a—from an attorney standpoint, in pretty good shape compared to me." Handsborough Dep. at 141. Nor was Handsborough aware of any threats by the Department to assess a $9.5 million fine against Plaintiffs or to impose possible fines against individual employees. *Id.* at 141-42. Josh Harrison, the IDOI enforcement attorney testified: "I have, over ten years of legal practice, always laid out what the maximum and minimum penalties are associated as part of settlement negotiations." Harrison Dep. at 77.

Ultimately, Plaintiffs agreed to pay the original fine ($70,082) and $42,202 to reimburse Indiana customers. Yonas and Rink also agreed to relinquish their Indiana insurance licenses because, as Harrison stated, "they did not feel that the profits they were receiving were worth the additional burden of continuing to have their license in the state." Harrison Dep. at 65. Harrison mailed a proposed Agreed Entry reflecting these terms to Plaintiffs on March 4, 2015. Dkt. No. 118-11.

Yonas discussed the terms of the proposed Agreed Entry with Rink; and both reportedly "felt that in order to not go into personal bankruptcy, [they] had to sign this." Yonas Dep. at 123. On March 13, 2015, Yonas emailed Harrison, stating: "We have decided that it is in our best interest to sign." Dkt. No. 118-11. The Agreed Entry set forth

each type as well as the total number of violations, all of which by this point were well known to Plaintiffs. Rink Dep. at 74-76.

Yonas and Rink signed the Agreed Entry under oath, certifying that they did so "voluntarily." Dkt. No. 118-10 (Agreed Entry). Sometime later, after reviewing Indiana's enforcement database, Rink and Yonas concluded that, compared to other agencies, they "got hammered." Yonas Dep. at 71.

On March 20, 2015, Robertson, as Indiana Commissioner of Insurance, entered a Final Order on the Agreed Entry ("Agreed Order"). Robertson was not involved in the negotiations of the terms of the agreement and does not recall being aware of this specific agreement or whether he knew at the time that American Homeland was an out-of-state company. Deposition of Stephen Robertson, Dkt. No. 118-13, ("Robertson Dep.") at 13, 78. Yonas and Rink never spoke to or otherwise communicated directly with Robertson about this agreement. Yonas Dep at 85, 89; Rink Dep. at 65.

This litigation ensued. Plaintiffs filed their Complaint ("Compl.") [Dkt. No. 1 on June 5, 2015), raising three claims: Violation of the Equal Protection and Commerce Clauses[3] pursuant to 42 U.S.C. § 1983 (Count I), Declaratory Judgment (Count II), and Injunctive Relief (Count III). The Complaint does not challenge the settlement as such; rather, it attacks Defendant's procedures and negotiations leading up to the parties' settlement, claiming that Defendant unconstitutionally subjected Plaintiffs

---

[3] After Defendant moved to dismiss Plaintiffs' Commerce Clause claim (Dkt. No. 78) and Plaintiffs conceded that this claim lacked merit (Dkt. No. 78), we dismissed the Commerce Clause claim in our February 8, 2017 Order (Dkt. No. 80).

to more aggressive enforcement of Indiana law based on their non-residency than it subjects Indiana companies to.

American Homeland contends that the IDOI, and Commissioner Robertson personally, target out-of-state title agencies by aggressively and selectively enforcing Indiana laws in an effort to enhance Robertson's political profile and to protect in-state Indiana businesses. *See* Compl. ¶¶ 28-29. American Homeland cites in support of its claim evidence such as press releases touting fines imposed on out-of-state companies while not publicizing fines charged to in-state companies, and the IDOI's statement that American Homeland's fines are "a perfect example of why out of state title companies shouldn't be handling Indiana deals." *Id.* ¶ 29. Plaintiffs reference in their Complaint certain IDOI data allegedly evincing preferential treatment of Indiana insurance companies over their out-of-state competitors, to wit, data showing a majority of the fines in excess of $10,000 have been assessed against out-of-state companies, *id.* ¶ 31, a majority of enforcement actions have been against out-of-state companies, *id.* ¶ 32, enforcement actions against out-of-state companies have been for multiple violations, whereas enforcement actions against Indiana companies have been limited to a single violation, *id.* ¶ 33, and when out-of-state companies fail to enter the requisite data on transactions, the fines charged against them have been greater than those charged against in-state companies for similar violations, *id.* ¶ 34.

In support of their claim, Plaintiffs rely on their proffered expert, Dr. Daniel Voss, a statistician, who compiled information relating to 47 agencies, each of whom was fined by the IDOI, comparing the amounts of those fines to the guidelines-penalties. Dr. Voss

concluded that there is a statistically significant higher level of fines and penalties imposed on out-of-state insurance title insurance companies than in-state. Dkt. Nos. 118-14, Deposition of Dr. Daniel Voss ("Voss Dep.') and 118-15. Defendant challenges the Voss analysis for having failed to take into account many other relevant factors, such as the agencies' histories of non-compliance, the severity of their violations and the number and extent of their violations, whether the sanctions were negotiated or simply imposed, or whether the companies' licenses ultimately were revoked.[4] Voss Dep. at 43, 52, 95, 99.

Handsborough has testified that there is no difference in the way investigations are conducted by the IDOI for resident and non-resident agencies, nor is there any difference in the enforcement methods. Handsborough Dep. at 9. Harrison testified that IDOI staff has never discussed giving preference to Indiana companies; in his view, the IDOI's purpose is to protect consumers in the insurance arena irrespective of where the company is based geographically. Harrison Dep. at 58-59.

In our September 30, 2016 order, we denied Defendant's Motion to Dismiss (Dkt. No. 69) and invited further briefing on the issue of standing. Given that Plaintiffs agreed to the terms set out in the Agreed Order by "agree[ing] to pay a fine, agree[ing] to refund customers certain sums and agree[ing] to allow the revocation of their licenses," we were unclear as to whether they had suffered a redressible injury sufficient to satisfy constitutional standing requirements. Dkt. No. 69 at 23-24 (referencing the tripartite test to

---

[4] Dr. Voss's report is the subject of Defendant's Motion in Limine [Dkt. No. 129]. We discuss below the motion to exclude Dr. Voss's opinions from the record before us as well as Plaintiffs' response to the motion.

satisfy standing under Article III of the Constitution, including that the court can provide a remedy for the alleged harm). In response to our order, Plaintiffs filed a Memorandum of Law on Standing ("Standing Memorandum") [Dkt. No. 75], to which Defendant responded [Dkt. No. 79].

On February 8, 2017, we ruled that Plaintiffs appeared to have successfully established their standing to pursue their Equal Protection claim based on the following claim:  that their settlement with the IDOI was the result of IDOI's discrimination against them and coercion, which made the Agreed Order unconscionable and void and thus unenforceable, in violation of their rights under the Equal Protection Clause of the Constitution. Dkt. No. 80 at 5. Defendant apparently agreed with this formulation, restating Plaintiffs' claim as follows:

> Plaintiffs do not dispute that if they're bound by the agreed entry then they lack standing.  That point is conceded.  They argue that they're not bound by the [settlement] agreement and thus the court may redress their grievance.

Dkt. No. 79 at 2. Giving Plaintiffs' claim the benefit of this crafting of their claim, we held that they had established standing to assert their claim under the Equal Protection Clause. Dkt. No. 80 at 5.

On October 16, 2017, Defendant filed the successive Motion to Dismiss now before us, again challenging Plaintiffs' lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1) [Dkt. No. 110] and, alternatively, seeking summary judgment pursuant to Rule 56.[5]

---

[5] Defendant has requested oral argument on the Motion to Dismiss [Dkt. No. 111 and 115 ("Def.'s Br.")] and Plaintiffs request an evidentiary hearing [Dkt. No. 129 ("Pls.' Resp.")].

Defendant asserts that, although standing issues were previously addressed in our September 2016 order to show cause and our February 2017 Order addressing standing, the issue requires further consideration and now, is "ripe for ruling with the benefit of discovery." Def.'s Br. at 2.

## Legal Analysis

### I. Standard of Review and Burden of Proof

#### A. Rule 12(b)(1)

The Federal Rules of Civil Procedure command courts to dismiss any suit over which they lack subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). In order to retain subject matter jurisdiction, there must be an actual case or controversy for the court to decide. *Spokeo, Inc. v. Robins*, 136 S.Ct.1540, 1546-47 (2016). Standing is an essential component of Article III's case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As a jurisdictional requirement, plaintiff bears the burden of establishing standing. *Warth v. Seldin,* 422 U.S. 490, 498 (1975); *Reid L. v. Ill. State Bd. of Educ.,* 358 F.3d 511, 515 (7th Cir. 2004). Because standing is "not [a] mere pleading requirement[] but rather an indispensable part of the plaintiff's case, [it] must be supported in the same way as any other matter on which the plaintiff bears the burden of

---

We deny these requests because the parties have had an ample opportunity to be heard, and the Court perceives no real benefit from holding oral argument. This case, in any event, differs from the ones in which the Seventh Circuit has held that an evidentiary hearing was required. *Apex Digistal, Inc. v. Sears, Reobuck & Company*, 572 F.3d 440, 444 (7th Cir. 2009).

proof, *i.e.*, with the manner an degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

As the Supreme Court has explained, a jurisdictional challenge at the summary judgment stage borrows the evidentiary requirements and procedures from those under Rule 56; thus, "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." In response to a Rule 12(b)(1) motion that is supported by evidence, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Id*. While there may be facts in dispute, dismissal under Rule 12(b)(1) is warranted only if those facts are not outcome determinative. *Cf. Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).

## B.  Summary Judgment

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual issue is material only if resolving such issue might change the suit's outcome under the governing law. *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). Disputes as to material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Nichols v. Michigan City Plan Planning Dept.*, 755 F.3d 594, 599 (7th Cir. 2014).

The moving party bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325. In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255; *Yahnke v. Kane County, Illinois*, 823 F.3d 1066, 1070 (7th Cir. 2016).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate. *See Naficy v. Illinois Dept't of Human Servs.,* 697 F.3d 504, 509 (7th Cir. 2012). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322. Further, a failure to prove one essential element necessarily renders all other facts immaterial. *Id.* at 323.

## II.     Discussion

### A. Standing

The Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth,* 422 U.S. at 498. The "irreducible constitutional minimum of standing" consists of three requirements:

> First the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan*, 504 U.S. at 560-61.

The issue here with regard to standing is whether Plaintiffs based on the manner in which that agreement was entered into have standing to pursue a § 1983 claim against the IDOI under the Equal Protection Clause after having signed the Agreed Order in which they accepted a final resolution of their dispute with the agency and thus have nothing to gain in this litigation because they are bound by those contractual terms.

The crux of the issue, as the parties seem to agree, is whether Plaintiffs have shown a judicially redressible injury.[6] Defendant argues that, in light of Plaintiffs'

---

[6] Given that Defendant challenges only the third element of standing, in addressing the parties' arguments we assume that Plaintiffs' claims sufficiently establish a concrete,

execution of the Agreed Entry, there is no judicially redressible injury. Plaintiffs, of course, disagree.

The redressibilty element of the standing inquiry "examines the causal connection between the alleged injury and the [available] judicial relief." *Allen v. Wright*, 468 U.S. 737, 752 n.19 (1984). Plaintiffs must demonstrate that it is "likely,' as opposed to merely speculative,' that [if the alleged injury is proven it] will be 'redressed by a favorable decision.'" *Lujan* at 561; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

Defendant's jurisdictional attack deprives Plaintiffs of any presumptive truthfulness that would otherwise attach to their allegations, but the existence of disputed material facts will not preclude us from evaluating for the merits of jurisdictional claims. We revisit the factual basis of standing because Defendant has successfully called it into question. *Lujan*, 504 U.S. at 561. Plaintiffs are thus required to come forward with competent proof that they have standing to assert their claims.

Plaintiffs maintain that the existence of the Agreed Order does not foreclose their claim that they have suffered a redressible harm. The relief Plaintiffs seek is a permanent injunction preventing the enforcement of the Agreed Order thereby relieving them of the obligation to pay the referenced fines and penalties and to surrender their Indiana

---

particularized, and actual injury and that this injury is "fairly traceable to defendant's conduct." *Lexmark Intn'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 n.6 (2014).

insurance licenses. They also seek an award of money damages as vindication of their constitutional rights and to compensate them for the harm to their reputations. Pls.' Resp. at 43. Thus, the alleged infringement of their equal protection right is a sufficient claim to confer standing. Indeed, according to Plaintiffs, success on the constitutional claim would vitiate the Agreed Order.

Defendant's standing argument rests on their assertion that the fate of Plaintiffs' claim turns on the enforceability of the Agreed Order. But the enforceability of the Agreed Order is a different question, one that is governed by substantive Indiana law, as opposed to standing principles. *See Beverly v. Abbott Labs*., 817 F.3d 328, 333 (7th Cir. 2016) ("State contract law governs issues concerning the formation, construction, and enforcement of settlement agreements."); *Perry v. Thomas*, 482 U.S. 483, 592 (1987) (rejecting an argument that plaintiff's inability to enforce an agreement raised a standing problem and characterizing the matter as a "straightforward issue of contract interpretation.").

Defendant seems to agree, when he argues that "[a]bsent [any] authority voiding the agreed Entry, Plaintiffs are not entitled to pursue their 42 U.S.C. § 1983 claim for lack of standing because there would be no relief available to them even if they prevailed. Def.'s Reply at 3. But Defendant's order of analysis is incorrect: the Court must first determine whether the § 1983 claim has legal substance and, depending on the answer to that question, we then may or may not examine the enforceability of the Agreed Order.

We turn, therefore, to the merits of Plaintiffs' Equal Protection claim.

### B. Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV.); *see General Motors Corp. v. Tracy*, 519 U.S. 278 (1997) (holding that the principle of equal protection law applies to whether a state law discriminates against out-of-state actors relative to in-state actors).

In the case before us, the parties do not dispute that the appropriate standard of review of the challenged state policy/practice is rational basis. Pls.' Resp. at 24. Rational basis review requires a plaintiff to prove that: (1) the defendant intentionally treated the plaintiff differently from others similarly situated; (2) the difference in treatment was caused by the plaintiff's membership in the class to which it belongs; and (3) the different treatment was not rationally related to a legitimate state interest. *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009) (citing *Smith v. City of Chicago,* 457 F.3d 643, 650–51 (7th Cir. 2006)). To succeed on its claim of an Equal Protection violation, Plaintiffs must be able to establish each of the three elements listed above with regard to the alleged IDOI policy favoring in-state agencies.

Plaintiffs' claims against Defendant are brought against him in his individual and his official capacities. We treat the suit against the Commissioner in his official capacity as a suit against the IDOI. *See Brock v. Casteel*, No. 1:13-CV-01577-DMLTWP, 2015 WL 3439236, at *3 (S.D. Ind. May 28, 2015) ("A suit against an officer in

his official capacity 'generally represent[s] only another way of pleading an action against [the] entity of which [the] officer is an agent.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). In his individual capacity, Plaintiffs seek money damages against Commissioner Robertson, personally. Defendant argues that Plaintiffs' claim for damages against him in his individual capacity should be dismissed for two independent reasons: (1) he was acting as an adjudicative decision-maker clothed with absolute immunity; and (2) his conduct was too far removed from the underlying allegations of which Plaintiffs complain to be personally liable. We address these claims and counterarguments in turn.

## 1. Official Capacity Claim

In advancing their Equal Protection claim, Plaintiffs allege that the IDOI treats in-state title companies more favorably than out-of-state companies both in terms of the number of violations cited against them as well as the amount of fines assessed. Plaintiffs further allege that the IDOI intentionally treated them in particular less favorably and less fairly than in-state companies based simply on their being out-of-state companies. Compl. ¶ 43. Plaintiffs argue that this disadvantageous treatment policy lacks a rational basis.

Plaintiffs rely in their briefing on a "mosaic" of evidence showing discriminatory intent by the IDOI, including the following: (1) the comment by Handsborough that if American Homeland was not "writing the business in Indiana, people in Indiana would," and the resulting inference that the IDOI sought to give preferential treatment to in-state companies; (2) Defendant's failure to follow its internal Guidelines, under which they

contend they should have a lesser punishment than the revocation of their licenses and the fines and penalties actually assessed; and (3) Dr. Voss's statistical finding that IDOI had a pattern and practice of deviating from the Guidelines for out-of-state companies to the disadvantage of out of state companies and his opinion that there is a statistically significant difference between fines and penalties imposed on in- and out-of-state companies reflecting higher assessments against the latter during the period when the Agreed Order was executed (from September 5, 2014 to June 2015).

Defendant seeks summary judgment on Plaintiffs' Equal Protection claim because Plaintiffs have not submitted competent, admissible evidence to raise a triable issue of fact establishing that the Commissioner discriminated against out-of-state companies generally and Plaintiffs specifically. After a careful review, we conclude that none of Plaintiffs' factual assertions satisfies their burden to establish the three required elements of an Equal Protection claim.

Plaintiffs' reliance on a single statement by auditor Handsborough made during a phone conversation with Rink and Yonas ("if you guys aren't writing this business in Indiana people in Indiana would probably be writing it.") does not suffice as evidence of the IDOI's preferential treatment of in-state companies. This argument by Plaintiffs requires that Handsborough's statement be taken entirely out of context. As Handsborough clarified, Plaintiffs "were talking about not needing the business in Indiana, said we don't need the business in Indiana, we have enough business in Ohio, so on and so forth, so I made the statement after they continued to hover on that that if you guys aren't writing the business in Indiana, then someone else will write the Indiana

business." Handsborough Dep. at 127. Continuing, Handsborough said: "Whether it's in state or out of state, it will get written." *Id*. at 127.

While not entirely clear to us what Handsborough meant by this statement, it at least certainly does not reflect a preference for in-state insurance companies, which is the reason for which it is cited by Plaintiffs. At best, it appears to be an innocuous, passing response to a comment by Rink and Yonas suggesting that American Homeland's departure from the Indiana market would be detrimental to Indiana consumers.

We agree with Defendant that this remark is aptly characterized as a stray remark. Defendant relies on the stray remark doctrine, which courts have applied to other out-of-state discrimination cases like this one. Def.'s Br. at 17 (listing cases). Under that doctrine, "to be probative of discrimination, isolated comments must be contemporaneous with the employment decision or causally related to the decision making process." *DeWeese v. DaimlerChrysler Corp.*, 120 F. Supp. 2d 735, 746 (S.D. Ind. 2000) (quoting *Geier v. Medtronic, Inc*., 99 F.3d 238, 242 (7th Cir. 1996)); *see also Castro v. DeVry Univ., Inc*., 786 F.3d 559, 568 (7th Cir. 2015) (finding stray discriminatory remark insufficient to beat summary judgment). "Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision." *Perez v. Thorntons, Inc*., 731 F.3d 699, 709 (7th Cir. 2013); *but see Petts v. Rocklege Furniture LLC*, 534 F.3d 715, 723 (7th Cir. 2008) ("ambiguous statements may provide circumstantial evidence of discriminatory intent to defeat summary judgment."); *O'Connor v. DePaul University*, 123 F.3d 374, 385 (7th Cir. 2008) (directing courts "to consider the plaintiff's evidence as a whole."). This statement

falls well short of demonstrating a discriminatory intent on the part of the IDOI. Handsborough's own testimony on the issue makes clear that the opposite is true: there is no difference in the way investigations are conducted in the case of in- and out-of-state companies, nor is there any disparity in IDOI enforcement. Handsborough Dep. at 8. It is also undisputed that Handsborough lacked final decision-making authority, and Plaintiffs do not point to any evidence that Handsborough's superiors, including the Commissioner, were made aware of, sanctioned or ratified the allegedly discriminatory remark, or allowed it to influence their decision as to the Agreed Order's contents.

Even if Handsborough's statement were construed as probative, admissible discrimination, it does not constitute evidence from which a reasonable trier of fact would conclude that the IDOI discriminated against out-of-state agents or agencies. *Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997) ("stray remarks must be considered in the context of all the evidence, and may not overcome summary judgment if they stand alone as evidence that might support an inference of pretext.").

Plaintiffs next assert that the IDOI's discrimination against out-of-state companies is evidenced by its enforcement Guidelines, under which they claim they should have received a much lower penalty than the revocation of their licenses and a fine in the amount of $72, 082. Plaintiffs concede that the failure to follow the Guidelines is not conclusive evidence of discrimination but provides a starting point for showing the IDOI's discriminatory intent. Plaintiffs' Guidelines-based claim hinges entirely on the analysis of Dr. Voss, their hired statistician, who concluded that the data he reviewed discloses that the IDOI has a pattern and practice of disadvantaging out-of-state

companies by deviating from the IDOI's Guidelines. We thus turn to a discussion of Dr. Voss's report.

Defendant vigorously objects to the admissibility Dr. Voss's report on multiple grounds in its motion in limine. Defendant complains that Dr. Voss's expert report was neither signed nor prepared by Dr. Voss, but instead by counsel, which violates Federal Rule of Civil Procedure 26(a)(2)(B). Defendant also asserts that Dr. Voss's report cannot satisfy the admissibility standards set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), due to a lack of sufficient facts and data to support its conclusion and its failure to take into account other controlling factors considered by the IDOI in imposing sanctions, the compliance histories of various insurance agencies whom he cites in his study, the severity and number of their violations, and the nature and extent of the resulting sanctions.

Plaintiffs do not dispute that the Voss report was signed by counsel and not by the witness but characterized that error as a harmless procedural one, having submitted with their response to the pending motions an identical report signed by Dr. Voss as required by Federal Rule of Civil Procedure 37(c)(1). Notably, they say, Defendant was able to question Dr. Voss about the Expert Disclosure, and Dr. Voss testified that it was his expert report, which contained all requisite information. Defendant cannot claim surprise or prejudice under these circumstances, Plaintiffs stress. With regard to the preparation of the report, Plaintiffs argue that this is an example of a (permissible) situation in which their attorneys assisted their witness, who had offered expert testimony only once before, in drafting his expert report.

Even if the Voss report had satisfied the requirements of Rule 26(a)(2), Defendant seeks to exclude the testimony of Dr. Voss under Federal Rules of Evidence 403 and 702 and *Daubert*, 509 U.S. at 579. We find this motion to exclude persuasive.

As the Seventh Circuit has explained,

> Federal Rule of Evidence 702 allows an expert witness to testify about a relevant scientific issue in contention if his testimony is based on sufficient data and is the product of a reliable methodology correctly applied to the facts of the case. Under the *Daubert* framework, the district court is tasked with determining whether a given expert is qualified to testify in the case in question and whether his testimony is scientifically reliable. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990).

*Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citation omitted). "[T]he proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Here, Defendant argues that the report should be excluded for two independent reasons, pursuant to Federal Rules of Evidence 403 and 702 and *Daubert*: (1) the analysis set forth in the report is inherently unreliable for its incompleteness, including its failure to account for alternative explanations for the differentials; and (2) Dr. Voss's report does not include a conclusion regarding whether either the in- or out-of-state companies actually received more favorable treatment.

Dr. Voss's proposed data is on its face unreliable because it lacks a sufficient factual basis. The opinion rendered by Dr. Voss is that: (1) there is a perceptible discrepancy between the Guidelines fines and penalties and those actually imposed; and (2) this alleged discrepancy "depends upon" whether the company at issue is an in- or out-of-state entity. Voss Rpt. at 2. Defendant points out, and Plaintiff does not dispute, that Dr. Voss's report did not control for alternative causal variables in the data presented. Specifically, Voss failed to consider the compliance history of the agencies involved in the study, the severity of their conduct, the number of violations committed by the agencies, whether the fines and penalties were negotiated, and he admits that these variables could be relevant in explaining the disparities that he identifies between fines and penalties assessed on in- and out-of-state agencies.

Plaintiffs urge us to disregard this deficiency, arguing that the Guidelines themselves control for all relevant favors. To the extent this may be true, Plaintiffs have not shown it to be so. Rather, the conclusion is tied completely to Guidelines and it is not clear that this information is coextensive with other reasonable non-discriminatory explanations. Further, while Plaintiffs point to testimony by the IDOI that the Guidelines were rarely if ever deviated from, there is no explanation for either the causes for the deviation or their impact. *See People Who Care v. Rockford Board of Education*., 111 F.3d 528, 537-38 (7th Cir. 1997) ("s statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court.").

The failure to take into account these significant potential causal variables renders Dr. Voss's testimony unreliable and thus excludable as tendered. It simply does not support an inference of discrimination. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616-617 (7th Cir. 2000) ("Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of discrimination.").

Dr. Voss's testimony is unreliable as well because his analysis is methodologically flawed and incomplete. The Court must make a preliminary assessment of an expert's methodology in terms of its scientific validity. *Daubert*, 509 U.S. at 592-93. As explained in Plaintiffs' expert report: "Voss compared the expected and actual amount of the fines and penalties imposed. The absolute value of the difference between the fines and penalties value calculated under the guidelines and the actual value of fines and penalties imposed provides a measure of discrepancy from the guidelines." Voss Rpt. at 2. This methodology is lacking in that it treats negative disparities as positive, comparing the degree of deviation from the Guidelines for in- versus out-of-state agencies, but without addressing which group was treated more favorably.

Plaintiffs admit that the Voss report measures only the size of the disparities, not whether they result in a prejudicial difference between the amounts of fines and penalties suggested by the Guidelines and those actually imposed. As Defendant points out, many of the deviations identified by Dr. Voss in fact favored out-of-state companies.

The level of discretion exercised by the IDOI in setting sanctions is not important unless it resulted in a benefit to either in-or out-of-state companies. Dr. Voss's report would not aid a jury in determining whether any discrepancy between the fines and penalties set

by the Guidelines and those actually imposed is based on the residency of the company at issue. Because Dr. Voss's report failed to address these critical factors in his analysis, it must be excluded from consideration. For all these reasons, we grant Defendant's Motion in Limine.

Without Dr. Voss's conclusions to buttress their claim of discrimination under the Equal Protection Clause, Plaintiffs are left with only their theory of an entitlement to relief. Without admissible evidence to show that the IDOI discriminated against out-of-state agencies, including Plaintiffs' in violation of the Equal Protection Clause Plaintiffs' official capacity claim against the IDOI cannot survive.

**2**. **Individual Capacity Claim[7]**

The same is true on Plaintiffs' claims against Defendant Robertson, personally. An individual cannot be held liable for a §1983 violation unless he directly caused or participated in the alleged constitutional deprivation. *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). Defendant asserts that, despite substantial discovery, Plaintiffs have not been able to adduce any evidence to show that the Commissioner participated in the alleged constitutional deprivation by imposing fines and penalties in a discriminatory fashion on Plaintiffs' as an out-of-state company.

It is undisputed that Commissioner Robertson was not a signatory to the Agreed Entry nor was he involved in the audit or negotiations process. In fact, Yonas and Rink

---

[7] Acknowledging that we denied its motion to dismiss on this basis in our September 2016 Order, Defendant contends that we did so only because, at that stage of the litigation, we were required to construe the allegations in Plaintiffs' Complaint in their favor.

fully admit that they had no contact with the Commissioner during any portion of their interactions with the IDOI. Further, IDOI employees Handsborough and Harrison have both testified that the Commissioner never issued any directives or instituted any policy or practice to give preferential treatment to Indiana agencies over out-of-state agencies. Handsborough Dep. at 9; Harrison Dep. at 58.

The Commissioner's only involvement in this matter was to sign the Agreed Order incorporating the terms of the Agreed Entry as a final step in the official issuance of the order. As such, he acted as the final decision maker in apparent accord with his lawful authority to accept, reject or modify fines and penalties imposed on title insurance agencies.

Plaintiffs point out that in a similar situation but one involving a different procedural posture, this Court held that the authority to make a decision on a license application is sufficient to allow for the survival of a section 1983 claim. *Daly v. Grajec*, 2007 WL 2286132 at *14 (S.D. Ind. 2007). That ruling is inapt in this case and does not preclude our ruling here, primarily because it involved a litigation where no discovery had been conducted.

Plaintiffs' only argument in opposition to summary judgment as to this part of their claim is that the Commissioner did not explicitly deny in his deposition testimony the allegation that he discriminated against Plaintiffs as an out-of-state company. When asked if he knew whether the fines and penalties imposed on American Homeland were based on their out-of-state status, Robertson responded that he did not know. Robertson Dep. at 76, 78. Plaintiffs attach undue importance to Roberston's responses that he "[did

not] not recall," noting that he advanced that reply more than 35 times during his 91-page deposition. Plaintiffs construe these non-responses as evidence of Robertson's discriminatory motive and intent. That's a stretch, at best. It is more likely that the questions he was being asked dealt with matters occurring below his rank and/or by other IDOI employees outside his knowledge or direct involvement. Without knowing the specific questions that elicited this repeated response, no reliable inference as to its meaning can be drawn.

Plaintiffs have now had the benefit of considerable discovery, and no evidence has surfaced to show that the Commissioner participated in the alleged constitutional deprivation. Notably, Plaintiffs continue to ignore his numerous statements under oath that he did <u>not</u> discriminate against Plaintiffs and does not discriminate against out-of-state actors. Robertson Dep. at 16, 51-52, 74-75, 77-78.

None of the cases cited by Plaintiffs support their claims that the Commissioner should be held personally liable for damages. These cases do not address the issues similar to the ones before us here. *See Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 615 (7th Cir. 2002) ("Under the notice pleading regime, these allegations, charitably read, suffice at this stage in the litigation . . . ."); *Titus v. Ill. DOT*, 828 F. Supp. 2d 957, 972 (N.D. Ill. 2011) ("At this stage of the proceedings, the Court finds that Plaintiff has sufficiently alleged the personal involvement . . . ."); *Daley v. Grajec*, No. 1:06-CV-1493JDTWTL, 2007 WL 2286132, at *14 (S.D. Ind. Aug. 7, 2007) (holding the plaintiff's "equal protection and due process claims do not survive summary judgment despite the fact that no discovery has been conducted"). Accordingly, we conclude that

Robertson is entitled to summary judgment on Plaintiffs' individual capacity claim against him.

Having failed to satisfy the essential elements of their Equal Protection claims, Plaintiffs are not entitled to have the Agreed Order vacated between them and the IDOI. . It is now enforceable as to its terms.

## Conclusion

For the foregoing reasons, Defendant's Motion in Limine is <u>GRANTED</u>, and summary judgment is <u>GRANTED</u> in favor of Defendant (and Commissioner Robertson) on the Equal Protection claims. Defendant's Motion to Dismiss for Lack of Standing and Motion for Oral Argument are <u>DENIED</u>. Final Judgment shall enter accordingly.

IT IS SO ORDERED.

Date: _____9/28/2018_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

David A. Arthur
INDIANA ATTORNEY GENERAL
David.Arthur@atg.in.gov

Harry Kennard Bennett
ken@hkbennettlaw.com

Joshua Adam Engel
ENGEL AND MARTIN LLC
engel@engelandmartin.com

John R. Maley
BARNES & THORNBURG, LLP (Indianapolis)
jmaley@btlaw.com

Mary Martin
ENGEL AND MARTIN LLC
martin@engelandmartin.com

Sara Marie McClammer
BENNETT & MCCLAMMER LLP
sara@bennettmcclammer.com

Leah Lewis Seigel
BARNES & THORNBURG, LLP (Indianapolis)
leah.seigel@btlaw.com